## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| N.T., *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>DISTRICT OF COLUMBIA,<br><br>        Defendant. | Case No. 23-cv-370-CRC-MJS |

### <u>REPORT AND RECOMMENDATION</u>

This case turns on whether the District of Columbia Public Schools ("DCPS" or the "District") offered a free appropriate public education ("FAPE") to minor student N.T. in keeping with the Individuals with Disabilities Education Act ("IDEA"). N.T. and his parents ("Plaintiffs") insist that DCPS failed to uphold its IDEA obligations across multiple school years, including 2020–21 (seventh grade for N.T.), 2021–22 (eighth grade), and 2022–23 (ninth grade). Plaintiffs' claims were denied in full at the administrative level, and they now seek judicial review. As is typical in IDEA cases, both Plaintiffs and DCPS have filed cross-motions for summary judgment based on the administrative record. Those motions are referred to the undersigned for a report and recommendation. The Court has carefully considered the administrative record and the parties' briefing and arguments. Because the Hearing Officer appropriately weighed the evidence presented to conclude that the District offered N.T. a FAPE in each of the challenged school years, and because Plaintiffs did not establish that their participation in N.T.'s educational placement was significantly impeded, the undersigned **RECOMMENDS** that the Court **DENY** Plaintiffs' motion for summary judgment (ECF No. 8) and **GRANT** the District's cross-motion (ECF No. 11).

## STATUTORY FRAMEWORK

Congress enacted the IDEA to help ensure all children with disabilities receive a "free appropriate public education" or "FAPE." *See* 20 U.S.C. § 1400(d)(1)(A). This mandate "requires an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 403 (2017).

The "IEP"—or "individualized education program"—is "the centerpiece of the statute's education delivery system[.]" *Id.* at 391. An IEP is a "comprehensive plan" prepared by a child's "IEP Team" that serves as "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).[1] Under the statute, an IEP must include "a statement of the child's present levels of academic achievement and functional performance," a list of "measurable annual … academic and functional goals," and "a description of how the child's progress toward meeting the annual goals … will be measured." *See* 20 U.S.C. § 1414(d)(1)(a)(i). An IEP must also identify the "special education and related services … that will be provided" to help the child "advance appropriately toward attaining the annual goals." *Id.* At least annually, the IEP Team must review and revise a child's IEP "as appropriate." *See id.* § 1414(d)(4).

More broadly, the IDEA requires that "'to the maximum extent appropriate,' public schools provide students with disabilities an education in the 'least restrictive environment' possible." *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018) (quoting 20 U.S.C. § 1412(a)(5)(A)). This generally means that the "removal of children from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (citation

---

[1] The composition of an "IEP Team" is prescribed by statute, 20 U.S.C. § 1414(d)(1)(B), and generally "includes teachers, school officials, and the child's parents," *Endrew F.*, 580 U.S. at 391.

and quotation marks omitted). Stated simply, "the IDEA requires that children with disabilities receive education in the regular classroom whenever possible." *Endrew F.*, 580 U.S. at 400 (citation and quotation marks omitted); *id.* at 401 ("[F]or most children, a FAPE will involve integration in the regular classroom[.]"); *see also Z.B.*, 888 F.3d at 528 (similar).

A court reviewing "an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis in original). After all, "Congress has not committed to educational perfection." *Z.B.*, 888 F.3d at 528; *Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015) ("[A] public school district need not guarantee the best possible education or even a potential-maximizing one.") (citation and quotations marks omitted). Equally important, a judicial assessment of an IEP's "substantive adequacy" must be based on information "as of the time each IEP was created rather than with the benefit of hindsight." *Edward M.R. v. Dist. of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). Putting these principles together, then, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to ensure the specific student's progress." *Z.B.*, 888 F.3d at 524.

## RELEVANT FACTUAL BACKGROUND

N.T. started with DCPS as a kindergartener in the 2013–14 school year at Murch Elementary School, where he remained through fourth grade (the 2017–18 school year). (ECF No. 7, Administrative Record ("AR") at 751, 1345.)[2] In the spring of 2018, DCPS found N.T. eligible for special education services as a student with multiple disabilities (AR at 741–50, 756), and

---

[2] Page citations to the AR refer to the running pagination at the lower middle margin. Page citations to the parties' briefing, by contrast, refer to the ones assigned by the Court's electronic filing system.

DCPS developed N.T.'s initial IEP in June 2018 (*id.* at 756). But N.T.'s parents were dissatisfied with the IEP proposed by the District, so they opted instead to unilaterally enroll him at the Lab School of Washington ("Lab School")—a full-time private school in the District of Columbia focused on children with learning disabilities—for N.T.'s fifth-grade year (the 2018–19 school year). (*Id.* at 1345.) N.T. has remained at the Lab School ever since.[3]

As relevant here, for three consecutive school years—2020–21 (N.T.'s seventh-grade year), 2021–22 (his eighth-grade year), and 2022–23 (his ninth-grade year)—the District developed IEPs for N.T. that would have facilitated his education at schools within the DCPS system, namely Alice Deal Middle School ("Deal") and Jackson-Reed High School ("Jackson-Reed"). But each year, Plaintiffs rejected DCPS's proposed IEPs as insufficient in their view. Plaintiffs instead chose to continue with N.T.'s placement at the Lab School.

The key elements of those IEPs, plus other relevant context, follows next.

## I.    The 2020–21 School Year (Seventh Grade)

In July 2020, prior to the start of N.T.'s seventh-grade year, a multi-disciplinary team at DCPS met to review and potentially revise N.T.'s IEP for the upcoming school year. (AR at 241–42.) Along with various DCPS representatives, the group included N.T.'s parents, certain Lab School representatives, and Plaintiffs' special education consultant, Rich Weinfeld. (*Id.*)

The District's IEP proposed: (a) ten hours of specialized instruction per week—split evenly between reading and written expression—to be delivered outside of the general education setting (*i.e.*, "pull-out" support); (b) five hours of specialized instruction per week in math to be delivered inside the general education setting (*i.e.*, "push-in" support); (c) forty-five minutes per week of

---

[3] The appropriateness of the District's IEP for the 2018–19 school year is not at issue here. Plaintiffs report that they filed a due-process complaint challenging the proposed IEP for the 2018–19 school year but ultimately reached a settlement with the District and withdrew the claims. (Pls.' Mem. at 5.)

behavior support services ("BSS") outside the general-education setting; (d) one hour per week of special education consultation services; and (e) one hour per month of BSS consultation. (*Id*. at 254.) The IEP also included a range of classroom aids and services, including "individualized and small group instruction," a "math fluency program," "extended time to formulate responses," a "reading fluency program," "comprehension monitoring," "homework reinforcement," "direct social skills instruction," "supportive teacher counseling," and more. (*Id.*) DCPS did not find N.T. eligible for speech-language services, against the wishes of N.T.'s parents. (*Id.* at 896.) This was in keeping with DCPS's determination in prior years.[4] But in response to input and feedback from N.T.'s parents, DCPS did add a word processor to N.T.'s accommodations. (*Id*. at 896.)

As noted, Plaintiffs disagreed with the IEP. They thought the specialized service hours were inadequate and wanted N.T. placed in "a full-time separate day school." (AR at 900–01; *see also* ECF No. 8 ("Pls.' Mem.") at 6 ("The parents, through counsel, stated that N.T. required a full-time program[.]").) In their view, "N.T. was only on grade level due to the intensive support he received at Lab," meaning the "services proposed by DCPS were insufficient." (Pls.' Mem. at 5.)

Following the IEP meeting, N.T.'s parents, through counsel, asked to learn more about N.T.'s potential placement at Deal. Because an in-person school observation was not possible due to the COVID-19 pandemic, DCPS instead proposed that Plaintiffs submit a list of written questions. (AR at 263–65.) In the final days of July 2020, Plaintiffs' legal counsel sent a list of questions on their behalf. (*Id*. at 1126.) A few weeks later, in mid-August 2020, N.T.'s parents served notice that N.T. would remain enrolled at the Lab School for the 2020–21 school year, and

---

[4] In 2019, for instance, a DCPS speech-language pathologist, Gayle Tunnage, reviewed a speech-language evaluation of N.T. conducted by the Lab School, and she conducted a classroom evaluation of N.T. at the Lab School that same year. Based on that information, Ms. Tunnage concluded that N.T. presented with oral communication skills commensurate with or above N.T.'s age-matched peers. (AR at 1469.)

they requested public funding for his placement, which DCPS denied. (*Id*. at 259–60.) By that point, Plaintiffs had not received answers to their questions from DCPS. (*Id*. at 1126.)

## II.    The 2021–22 School Year (Eighth Grade)

The following spring, in May 2021, DCPS convened an annual review of N.T.'s IEP for the upcoming school year. As before, along with DCPS representatives, N.T.'s parents participated in the meeting, as did Lab School representatives. (AR at 905.)

Through that proposed IEP, the District updated N.T.'s then-present levels of performance and goals to reflect his functioning in math, writing, reading, and social/emotional skills. (AR at 930.) As to specialized instruction, DCPS generally maintained the same levels of support as the prior IEP, with some variations, including: (a) five hours per week of "pull-out" support for written expression; (b) three hours per week of "pull-out" support for reading; (c) five hours per week of "push-in" support in math; (d) five hours per week or additional "push-in" special education services; (e) one hour per week of special education consulting services; (f) 180 minutes per month of "pull-out" BSS support; and (g) one hour per month of BSS consultation. (*Id*. at 254, 321.) DCPS also updated the supplemental aids and services for N.T. but continued to find him ineligible for speech and language services. (*Id.* at 921, 924, 930.) Beyond that, DCPS scheduled a follow-up meeting to further consider N.T.'s eligibility of occupational therapy ("OT"); following an OT assessment a few months later, the evaluator recommended OT services for N.T.'s sensory needs, and DCPS added those services to the IEP. (*Id.* at 357–65, 373.)[5]

As was true the prior year, N.T.'s parents disagreed with the IEP's specialized instruction hours and continued to maintain that N.T. required full-time placement in a special education

---

[5] Specifically, DCPS added to the IEP 60 minutes per month of OT services and another 60 minutes per month of OT consultation services. (AR at 933.)

setting. (Pls.' Mem. at 9 ("The parents, through counsel, again stated that N.T. required a full-time, small, supported environment with integrated services, and rejected the proposal of any time in the general education environment.").) They likewise contested the District's continuing determination that N.T. was ineligible for speech and language services. (AR at 930.)

On August 4, 2021, N.T.'s parents served notice of their intent to keep N.T. enrolled at the Lab School for the 2021–22 school year (*Id.* at 351.) More than two months later, in late October 2021, Plaintiffs' consultant, Mr. Weinfeld, contacted Deal to request an observation of N.T.'s proposed placement at the school. (*Id.* at 369.) The record indicates that Mr. Weinfeld was originally offered a virtual tour outside of normal school hours, but DCPS later communicated that only the parents themselves would be permitted to visit—not Mr. Weinfeld. (*Id.* at 368–69, 408.) And because of the ongoing COVID restrictions, DCPS advised that parent visits were not permitted during the school day but invited Plaintiffs to attend an open house at Deal scheduled for February 2022. (*Id.* at 406.) The open-house event was later postponed, and, according to Plaintiffs, they were never contacted with a new date. (*Id.* at 405–06, 1356.)

N.T. had a strong academic year in eighth grade, earning an "A" in each of his classes. (*Id.* at 967–972.) N.T. also continued to score above grade level and above same-aged peers in the District of Columbia, based on his Measures of Academic Progress ("MAP") scores. (*Id.* at 19.)[6] During this school year, in March 2022, the Lab School conducted an updated speech-language evaluation of N.T. (*Id.* at 17.) The evaluation report noted that N.T.'s scores demonstrated "hugely significant progress." (*Id.*) More specifically, N.T. possessed age-appropriate skills in making inferences and above-age expectations in formulating complex situational sentences. (*Id.*)

---

[6] Both the Lab School and DCPS use MAP to measure progress in math and language arts. (AR at 19).

### III.     2022–23 School Year (Ninth Grade)

For the 2022–23 school year, N.T. would be starting ninth grade and transitioning to high school. Several months prior, in May 2022, DCPS convened an IEP review meeting with appropriate DCPS representatives, N.T.'s parents, and others. (AR at 967.)

The District's proposed IEP once again updated N.T.'s then-present levels of performance and goals. (AR at 493.) As for specialized instruction, the IEP largely adhered to the levels from prior years, but with greater flexibility as to specific areas of focus for instruction, reportedly to allow for adjustments associated with N.T.'s transition to a high-school environment. Specifically, the proposal included: (a) ten hours per week of "pull-out" specialized instruction; (b) five hours per week of "push in" specialized instruction; (c) 180 minutes per month focused on BSS issues; (d) 180 minutes per month of OT services; and (e) 30 minutes per month of OT consultation services. (*Id*. at 508.) DCPS separately reviewed and updated the other supplemental aids and services offered to N.T. (*Id*. at 508, 510.) After reviewing an updated speech-language evaluation from the Lab School, DCPS determined that N.T. still "did not have communication issues at this time" and found him ineligible for speech and language services. (*Id*. at 493, 496.) DCPS proposed to implement the proposed IEP at Jackson-Reed, N.T.'s neighborhood high school. (*Id*. at 1145.)

For the third year in a row, Plaintiffs objected to the proposed IEP. (*Id*. at 17.) They believed N.T. needed a more restrictive environment and increased specialized instruction (*Id*.; Pls.' Mem. at 13 ("The parents … expressed significant concern about the appropriateness of the proposed placement at Jackson-Reed, stressing N.T.'s need for a small, supportive environment all day.").) Plaintiffs instead chose to keep N.T. enrolled at the Lab School for ninth grade. (AR at 18.)

## PROCEDURAL HISTORY

Plaintiffs filed a request for a due process hearing in July 2022, and the hearing took place in early November 2022. (AR at 4–5.) The hearing spanned five days and encompassed testimony from fifteen witnesses. On November 21, 2022, the Hearing Officer (Coles B. Ruff, Esq.) issued a decision denying Plaintiffs' requested relief and dismissing their claims.

Plaintiffs then timely sought judicial review with this Court. (*See generally* Compl., ECF No. 1.) Through their claims, Plaintiffs contend that each of the three IEPs discussed above fell short of the District's obligations to provide N.T. with a FAPE under the IDEA, and they argue the Hearing Officer got it wrong in finding that their ability to "meaningfully participate" in the decision-making process surrounding N.T.'s educational placement was not significantly impeded. They ask the Court to order DCPS to provide reimbursement for N.T.'s tuition and related services at the Lab School for the 2020–21, 2021–22, and 2022–23 school years. (*Id.* at 16.)

Plaintiffs and the District have now filed cross-motions for summary judgment based on the administrative record, and those motions are referred to the undersigned for a report and recommendation. The motions are ripe for resolution. This ruling now follows.

## STANDARD OF REVIEW

Although motions seeking review of a hearing officer decision under the IDEA are typically framed as motions for summary judgment, the Court does not follow "a true summary judgment procedure." *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). Rather, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Put another way, the motion for summary judgment is "the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citation omitted).

On judicial review, courts "shall grant such relief as [they] determine[] is appropriate" based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see also Rowley*, 458 U.S. at 205–06. In doing so, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, courts "must give due weight to the administrative proceedings and afford some deference to the expertise of the [independent hearing officer] and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 109 (D.D.C. 2010) (citing *Lyons v. Smith*, 829 F. Supp. 414, 418 (D.D.C. 1993) (quotation marks omitted)).

As a general matter, "a hearing officer's findings 'based on credibility determinations of live witness testimony' are given 'particular deference' where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014) (citation omitted). But at the same time, "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F. 2d 84, 87 (D.C. Cir. 1991)).

## DISCUSSION

As previewed, Plaintiffs take aim at the District's proposed IEPs across three consecutive school years: 2020–21 (seventh grade), 2021–22 (eighth grade), and 2022–23 (ninth grade). Their core theories boil down to arguing that the Hearing Officer erred by: (1) misarticulating the "central issue" before him, at least as to two of the three contested IEPs; (2) improperly deferring to DCPS witnesses, despite their alleged lack of personal knowledge about N.T. and their alleged failure to offer a "cogent or responsive" explanation supporting N.T.'s proposed IEPs; and (3) wrongly

excusing the District's alleged failure to allow them to "meaningfully participate" in N.T.'s educational placements. Beyond that, Plaintiffs complain along the way about a few other aspects of the Hearing Officer's decision. The Court addresses these arguments in turn.

## I.    The Hearing Officer Properly Framed The Relevant Issue(s)

Plaintiffs' lead argument posits that the Hearing Officer "completely misunderstood the issue before him as it relates to the appropriateness of the proposed IEPs for the 2021–2022 and 2022–2023 school years." (Pls.' Mem. at 15–17.)[7] Plaintiffs say the Hearing Officer wrongly focused on "whether N.T. required placement in a full-time special education setting" instead of "whether DCPS had proposed an appropriate IEP and placement for N.T." (*Id.* at 17.) They insist that "as a result of this faulty analysis of the primary question," the Hearing Officer's entire decision "is entitled to no deference and should be overturned." (*Id.* at 18.) Not so.

This theory is an exercise in semantics, and it certainly is not "dispositive," as Plaintiffs suggest. (*See id.* at 16.) After all, the thrust of Plaintiffs' dissatisfaction with the proposed IEPs across the years—or, to use Plaintiffs' own phrasing, the main reason they believed DCPS was not offering "an appropriate IEP and placement for N.T."—was because the proposals did not offer a full-time special education setting. (*See* Pls.' Mem. at 6 (describing Plaintiffs' rejection of the July 2020 IEP based on their belief "that N.T. required a full-time program"); *id.* at 9 (same as to the May 2021 IEP: opining that "N.T. required a full-time, small, supported environment" without "any time in the general education environment"); *id.* at 13 (similar as to the May 2022 IEP).) Put differently, Plaintiffs' dueling articulations of the so-called "central issue" are two sides of the same coin: the supposed inappropriateness of the IEPs was grounded in the absence of a full-time special education setting, and vice versa. So the Court sees nothing wrong with the Hearing

_____

[7] Plaintiffs concede that the Hearing Officer did appropriately frame the issue for the June 2020 IEP focused on the 2020–21 school year, but they still "disagree with his ultimate conclusion." (Pls.' Mem. at 15 n.1.)

Officer's framing of the issue(s) in this way, especially because the Hearing Officer proceeded to evaluate the sufficiency of each of the challenged IEPs on its own terms to assess whether each IEP was reasonably calculated to enable N.T. to make appropriate educational progress.

At least one other judge in this District rejected this same theory in another case brought by Plaintiffs' same counsel. *A.D. v. Dist. of Columbia*, 2022 WL 683570, at *8 (D.D.C. Mar. 8, 2022) ("Rather than demonstrating any failure to resolve the main inquiry, as plaintiffs protest, the challenged [decision's] more tailored framing of the issue instead reflects an understanding of the flashpoint animating the parties' dispute over the 2019 IEP: whether A.D. could be partially educated with non-disabled peers (as DCPS concluded) or whether she required a full-time placement in specialized instruction (as her parents requested)."). The undersigned finds that analysis persuasive and on point. And to borrow Judge Howell's words, Plaintiffs' lead argument on this point is an attempt to "manufacture error … out of whole cloth." *Id.*

## II.  The Hearing Officer Properly Weighed The Evidence And Made Appropriate Credibility Determinations In Evaluating The Challenged IEPs

Moving from semantics to substance, the Court concludes that the Hearing Officer properly found the challenged IEPs to be reasonable and appropriate under the IDEA and engaged in reasonable credibility findings. Plaintiffs' arguments to the contrary miss the mark.

As the District points out, Plaintiffs' challenges to the proposed IEPs were twofold: (1) "that [the IEPs] contained an inappropriate least restrictive environment (LRE) with insufficient hours of specialized instruction outside general education"; and (2) "that [the IEPs] did not include speech-language pathology services." (ECF No. 11 ("Def.'s Mem.") at 19 (referencing June 2020 IEP); *see also id.* at 19, 21 (summarizing the same core objections to the May 2021 and May 2022 IEPs).) The Court reviews the Hearing Officer's assessment of those two overarching points.

A.    **Full-Time Special Education Environment**

Plaintiffs principally contest the proposed IEPs because they would have placed N.T. in a general education setting for parts of the school day, instead of the full-time special education setting that Plaintiffs preferred. This complaint stretched across all three proposed IEPs.

On this issue, the Court uses the text of the IDEA as its jumping-off point:

> To the maximum extent appropriate, children with disabilities … are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). As the statute reflects, one of the IDEA's animating premises is that children be educated in a general education setting "to the maximum extent appropriate," reserving "special classes," "separate schooling," and "other removal of children" for unusual cases involving unusual facts. The Supreme Court and the D.C. Circuit have reemphasized this "imperative" several times over. *See, e.g.*, *Endrew F.*, 580 U.S. at 400 ("[T]he IDEA requires that children with disabilities receive education in the regular classroom whenever possible."); *Z.B.*, 888 F.3d at 528 (framing "the IDEA's imperative" in these same terms). So Plaintiffs' pursuit of full-time special education—while a scenario that can certainly be appropriate for some students in some circumstances—would be a departure from the IDEA's default mandate.

The Hearing Officer recognized this governing principle here (*see* AR at 24 (citing *Z.B.* and other authorities for this proposition)), explaining that DCPS's proposed IEPs were crafted with the IDEA's least-restrictive-environment objective in mind. In the Hearing Officer's words, the "IDEA's mandate that students be educated in the least restrictive environment and have access to non-disabled peers seems to have compelled DCPS to develop an IEP that was both academically challenging for [N.T.] and that provided [N.T.] the opportunity to be educated alongside [N.T.'s] non-disabled peers." (*Id.* at 26.) This served as a backdrop for the broader

consideration of the proposed IEPs. And against it, the Hearing Officer weighed the competing evidence to find that it did "not demonstrate that [N.T.] was in need of specialized instruction throughout the school day and an LRE totally removed from non-disabled peers." (*Id.* at 31–32.)

For one thing, the Hearing Officer highlighted that N.T. had "above-average intellectual abilities" and "above-average academic performance." (AR at 26 ("The data demonstrate[d] that [N.T.] [was] performing academically above grade level of all students in the District of Columbia.").) For another, DCPS presented testimony from multiple witnesses in support of the idea that N.T. would realize benefits by spending time in a general-education setting. DCPS program specialist Nicole Manuel, as one example, testified as follows: "I think [N.T.] can benefit both academically as well as behaviorally. We know this is a student who does struggle with interpersonal skills and initiating and sustaining friendships, and so [N.T.] being able to be around his neurotypical peers and learn from them, as I mentioned, both academically and socially, will be advantageous for [N.T.]." (AR at 1547.) Other DCPS witnesses, all of whom were qualified by the Hearing Officer as experts in special education programming and placement, testified similarly. (*See id.* at 1514, 1516, 1642–43, 1681.)[8] The Hearing Officer reasonably credited that testimony. *See, e.g.*, *N.G. v. Dist. of Columbia*, 2022 WL 188403, at *7–8 (D.D.C. Jan. 20, 2022) (discussing hearing officer's endorsement of testimony that student "needed to be with her 'non-disabled

---

[8] More specifically, the Hearing Officer heard the following additional testimony about the benefits that N.T. was expected to realize from at least some time spent in a general education environment: DCPS Social Worker, Regina Miller Nadir (*see* AR at 1514, 1516) ("The goal is always again … for young people to be able to interface with … their normative peers …[] because … we want to be able to see the young person being able to navigate the nuances of … an educational setting…. We also want to be able to see them utilize some of the coping strategies, if not all … that were … taught to them in social emotional milieu, or therapeutic milieu…. Based on [N.T.'s] profile, I would not say that he needs a full-time special education support."); DCPS Central IEP Team member, Jasmine Leal-Taylor (*id.* at 1643) ("[S]tudents do learn best from other peers, and [N.T.] has these skills to perform in a general education class, I did find that to be appropriate for him to be in general education for some of the services.")); and DCPS Central IEP Team member, Lorie Easterly (*id.* at 1681) ("[N.T.] can benefit from [general education]…. [T]his would not be a student I would categorize as needing a full-time IEP at all.").

peers,' not secluded in specialized education"), *report and recommendation adopted*, 2022 WL 969964 (Mar. 31, 2022); *S.M. v. Dist. of Columbia*, 2020 WL 7230266, at *5 (D.D.C. Dec. 8, 2020) (same as to testimony that student "benefitted from her time with typically developing peers").

And those considerations did not stand alone. The Hearing Officer weighed them alongside the fact that the District's IEPs offered considerable amounts of specialized instruction, including significant "pull-out" support for N.T. away from the general-education setting. Year over year, the calibrated levels of specialized support were meaningful. As the District aptly describes the May 2022 IEP, for example, DCPS's proposal would have "afforded N.T. with specialized instruction outside of general education for nearly *one-third of his school week*." (Def.'s Mem. at 25 (emphasis added).) In other words, the District's proposals struck a balance that would have integrated N.T. into the general education environment at some level—with an eye toward realizing certain benefits of that environment—while still offering specialized instruction for much of the school day and week in the sort of "small, supported environment" Plaintiffs preferred.

Based on these factors and a broader assessment of the record, the Hearing Officer concluded, across each of the school years at issue, that the "amount of specialized instruction provided by the IEP(s) that DCPS developed for [N.T.] … was reasonably calculated to enable [N.T.] to make progress appropriate in light of [his] circumstances." (AR at 26–27 (June 2020 IEP); *id.* at 31–32 (May 2021 IEP) (concluding the same and adding that the evidence did not show a "need for specialized instruction through the school day and an LRE totally removed from non-disabled peers"); *id.* at 34 (May 2022 IEP) (same).)

These determinations were reasonable and reasonably supported.[9]

---

[9] And, to tie back to the Court's rejection of Plaintiffs' lead argument that the Hearing Officer "misconstrued" the relevant issues, these determinations make clear why that was not so: the Hearing Officer's conclusions explained why the particular IEPs the District proposed were appropriate on their own terms, without focusing strictly on whether full-time special education was necessary.

### B.    <u>Speech-Language Services</u>

Plaintiffs also disagreed with DCPS's proposed IEPs because they did not offer separate speech-language services to N.T. The Hearing Officer sided with DCPS on this question, too. (AR at 25 ("[T]here is no evidence that [N.T.] needed speech-language [as] a related service."); *id.* at 31 (similar); *id.* at 34 (similar).) Plaintiffs' briefing in this Court hardly touches the issue, at least not in any concrete or fulsome way. But because it was one of the key points at the administrative level, and because the District's briefing tackles it head on, the Court addresses it.

In evaluating this issue, the Hearing Officer began by considering a speech-language evaluation of N.T. conducted by the Lab School in 2019, summarizing that data as follows:

> The evaluation revealed that [N.T.'s] receptive, expressive, and pragmatic language skills were age appropriate. [N.T.] initiated lively conversations and used an appropriate communication style. [N.T] had exceptional receptive single-word vocabulary, well above peers to understand words used in the classroom, in literature, in math, and in other content areas. The [Lab School] evaluator noted that [N.T] had greater vocabulary word knowledge than [he] was able to retrieve and use when speaking or writing, resulting in relative difficulty formulating concise and succinct responses. In sum, the [Lab School] evaluator stated that [N.T.] demonstrated mostly average to above average oral language skills, though often not quite as high as expected given [N.T.']s superior cognitive profile.

(AR at 24.) The Hearing Officer then weighed the evaluation data alongside the opinions of two witnesses: N.T.'s speech-language pathologist at the Lab School, Ms. Kunz, and a DCPS speech-language pathologist, Ms. Tunnage. (*Id.* at 24–25.)[10] Ms. Tunnage opined that N.T. "did not have a disabling speech disorder that would qualify [N.T.] to be provided speech-language services"; she agreed that the evaluation identified a need for an increased focus in written expression but explained that was an area that DCPS "generally address[es] through specialized instruction rather than through the services of [a speech-language pathologist]." (*Id.* at 25.)

---

[10] Ms. Tunnage reviewed the evaluation and separately observed N.T. at the Lab School. (AR at 25.)

Ultimately, the Hearing Officer credited Ms. Tunnage over the Lab School's speech-language pathologist, Ms. Kunz:

> The testimony of [Ms. Tunnage], coupled with the evaluation data that demonstrated [N.T.'s] age-appropriate receptive, express, and pragmatic language skills, was both compelling and convincing and far more credible than the testimony of [Ms. Kunz], even though she conducted the initial speech-language evaluation of [N.T.] and is otherwise familiar with [him] through [his] attendance at [the Lab School].

(*Id.*) And based on that credibility assessment, the Hearing Officer found that DCPS carried its burden to demonstrate that N.T. did not need speech-language services as a separate component of the IEPs. This rationale carried across the relevant years. (*Id.* at 31 ("There was no evidence that [N.T.'s] speech-language skills had declined. Rather, the evidence demonstrates that [N.T.'s] language skills had improved.") (2021–22 school year); *id.* at 34 (similar) (2022–23 school year)). Moreover, as to the 2022–23 school year, the Hearing Officer also considered an updated speech-language evaluation for N.T. completed by the Lab School in March 2022, which showed, in the Hearing Officer's words, "hugely significant progress" from the prior evaluation. (*Id.* at 17, 34.)

Once again, these determinations were reasonable and reasonably supported.[11]

### C.    Plaintiffs' Credibility-Focused Challenges

Against those overall findings, Plaintiffs argue the Hearing Officer gave excessive and undue deference to the District's witnesses over their own witnesses. This line of argument takes a few different forms, but all are basically variations on the same theme. None persuades.

For starters, Plaintiffs complain that none of DCPS's witness "had ever seen N.T"—an alleged "lack of knowledge" they call "nothing less than astounding"—while painting their own

---

[11] Plaintiffs, somewhat offhandedly, accuse the Hearing Officer of "fail[ing] to recognize that DCPS held the burden of proof as to the appropriateness of its IEPs." (Pls.' Mem. at 17.) But a quick glance at the decision shows otherwise. (*See* AR at 22 ("Respondent *sustained the burden of proof* … that the IEP that DCPS developed … was reasonable calculated to enable [N.T.] to make progress appropriate in light of [his] circumstances.") (emphasis added); *id.* at 30 (same); *id.* at 34 (same).)

witnesses as "much more knowledgeable" about N.T. personally. (Pls.' Mem. at 21–22.) Because of this, Plaintiffs insist their witnesses deserved far more deference than the District's. (*See id.* at 21 (("[T]here was simply no explanation for why the school system had such little knowledge of N.T.").) But Plaintiffs cite no caselaw or authority for such a categorical credibility rule. In fact, several cases point the opposite way. *See, e.g.*, *H.R. v. Dist. of Columbia*, 2024 WL 3580663, at *5 (D.D.C. July 30, 2024) (rejecting similar argument that a hearing officer gave "undue weight to the District's witnesses who had not personally observed" the student); *N.G.*, 2022 WL 188403, at *6 (similar, where plaintiffs argued that a hearing officer improperly credited DCPS witnesses who had "no personal knowledge of [the student]" over their witnesses, "who had observed [the student] on 'countless occasions' during her time at the Lab School").

Rightly so. After all, witness credibility turns on all sorts of factors, and hearing officers are entrusted in the first instance with making credibility findings that fit the facts of a particular case without regard to bright-line rules. *See, e.g.*, *B.B. v. Dist. of Columbia*, 2022 WL 834146, at *10 (D.D.C. Mar. 21, 2022) ("Hearing Officers have the opportunity to hear testimony in person, examine the demeanor of the witness and reactions of the participants, and bring immeasurable experience and expertise in this specialized area.") (citation and quotation marks omitted); *S.M.,* 2020 WL 7230266, at *6 (recognizing that a hearing officer's "credibility determinations benefit from first-hand observation of live testimony," whereas courts "can only review transcripts"). Plus, the challenged DCPS witnesses were all certified as experts with experience and qualifications to review assessments, evaluations, and other information to develop IEPs. In this way, the witnesses' personal interactions with N.T. (or not) were not especially material to their testimony. Plaintiffs essentially make this same point in defense of their own evidence. Responding to the Hearing Officer's observation that Plaintiffs' witnesses generally "had not taught [N.T.] in the classroom"

(AR at 26), Plaintiffs rejoin that "there is no requirement that, in order to be a credible witness, a person needs to have taught the student" (Pls.' Mem. at 23). True enough. But just as Plaintiffs eschew categorical credibility rules in that respect, it is no less appropriate to do so more broadly.

Beyond that, Plaintiffs invoke *Endrew F.* for the proposition that "[a] reviewing court may fairly expect [school] authorities to be able to offer a *cogent and responsive* explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." (Pls.' Mem. at 19 (quoting *Endrew F.*, 580 U.S. at 404) (emphasis added).) Plaintiffs say the District fell short of this showing. The Court disagrees.

Plaintiffs go so far as to complain that "the words 'cogent and responsive' fail to appear" at all in the Hearing Officer's decision. (Pls.' Mem. at 21.) This argument seriously misreads *Endrew F.* After all, the Supreme Court was not pronouncing the phrase "cogent and responsive" as some sort of talismanic incantation that must appear on the pages of all IDEA decisions. *See, e.g.*, *H.R. v. Dist. of Columbia*, 2024 WL 134444, at *17 (D.D.C. Mar. 29, 2024) (agreeing that decisions are "not deficient for their failure to use the words 'cogent and responsive'"), *report and recommendation adopted*, 2024 WL 3580663 (D.D.C. July 30, 2024). The Court's point was about the substance of the school system's explanation, not certain magic words that must be used to describe it. And on the substance, for the reasons explained already, the Hearing Officer reasonably concluded that DCPS and its witnesses put forward the sort of "cogent and responsive explanation" envisioned by *Endrew F.* on the two core areas of disagreement—whether, even without full-time specialized placement and speech-language services, the District's proposed IEPs were reasonably calculated to allow N.T. to make progress in light of his specific circumstances.

In arguing otherwise, Plaintiffs lean heavily on *M.O. v. District of Columbia*, 20 F. Supp. 3d 31 (D.D.C. 2013). There, the court remanded a case because the decision "lack[ed] sufficiently

detailed reasoning," as the hearing officer did "little to address" the plaintiffs' evidence or explain why the school system's assessment was credited over the assessment of plaintiffs' witnesses. *See id.* at 40–41. But this case is a far cry from *M.O.* because the Hearing Officer here did consider and weigh the testimony of Plaintiffs' witnesses in a manner that allows for meaningful review. On the issue of speech-language services, for instance, the Hearing Officer discussed at some length the Lab School's and the District's competing assessments, concluding that the latter opinions were more consistent with the evaluation data and thus "far more credible." (AR at 24–25.) The Hearing Officer likewise "considered closely the concerns expressed by [N.T.'s] mother than [he] can, at times, shut down because of overstimulation from loud and crowded environments," including Plaintiffs' belief that N.T. "would have had and will have such an adverse reaction if [he] attended either" Deal or Jackson-Reed. (*Id.* at 26.) The same was true for similar concerns echoed by Plaintiffs' other witnesses, who shared their own views about N.T.'s need for "small group" and "specialized instruction throughout the day." (*Id.* at 19–20.) But the Hearing Officer weighed that testimony and those concerns against other evidence in the record about N.T.'s strong academic performance and aptitude, and against DCPS's effort to strike a balance in offering N.T. "individualized and small group instruction" while educating N.T. in the "least restrictive environment … alongside … non-disabled peers," where practicable. (*Id.* at 26–27.) In short, the Hearing Officer considered Plaintiffs' evidence, discussed that evidence, and reasonably weighed it against the record as a whole. *M.O.* is simply inapposite here.

Plaintiffs relatedly contend that the Hearing Officer erred by considering N.T.'s academic performance at the Lab School as relevant evidence bearing on the appropriateness of the District's proposed IEPs. Plaintiffs say it was "illogical" to point to N.T.'s success at the Lab School to conclude he does not require full-time special education services because, in their view, the full-

time special education environment at the Lab School is the only reason that N.T. made progress. (Pls.' Mem. at 34–35.) As support, Plaintiffs cite a single case, *N.G. v. District of Columbia*, which held that it was improper for a hearing officer to examine "only [a student's] performance in small, highly structured, private schools to determine" whether the student was eligible in the first place for special education services. 556 F. Supp. 2d 11, 35 (D.D.C. 2008) ("That [the student] can perform well in precisely the school environment recommended by her doctors does not mean she is not disabled[.]"). That scenario is quite different from what occurred here. After all, DCPS *did* find N.T. eligible for special education services in 2018, and nobody pointed to his performance at the Lab School to argue that he was ineligible for continued services—to the contrary, the District proposed IEPs that included significant specialized support. Instead, the Hearing Officer considered N.T.'s academic performance at the Lab School, among other relevant data points, to assess whether the District's proposed IEPs were reasonably calculated to allow N.T. to make progress. And that, of course, was reasonable because the IEP team would have considered that same data (among other considerations) at the time it crafted the IEPs. Indeed, if school districts could not consider the private-school academic progress of a student like N.T—who is enrolled in full-time private school year after year—it would mean they would essentially have to close their eyes to the student's academic progress altogether, which would make it impossible to craft "an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399. That outcome would upend the IDEA altogether.

Otherwise, insofar as Plaintiffs are arguing that N.T.'s private-school progress should be viewed as some sort of definitive evidence that his private-school placement was and remains necessary, that argument goes too far—particularly since Plaintiffs offer no precedential support for it. Put another way, the fact that N.T. was making progress in the "small, structured classes" in

the full-time special-education environment at the Lab School does not mean that the IEP team—and, subsequently, the Hearing Officer—must necessarily conclude that the full-time special education environment at the Lab School is the *only* place where N.T. could achieve academic progress for purposes of the IDEA. To be sure, the Hearing Officer recognized the possibility that at least some measure of N.T.'s academic performance may be attributable to his placement "in an environment with low student-to-teacher ratio in a school that focuses principally on students with learning disabilities." (AR at 26.) But the Hearing Officer likewise concluded, based on the considerable record developed, that "the evidence [did] not support a conclusion that [N.T.] would have performed any less well given the level of services that DCPS prescribed in the IEPs it developed." (*Id.*) The Hearing Officer instead concluded that the District's proposed IEPs reasonably attempted to strike a balance between offering N.T. significant "specialized instruction" while affording an opportunity to be "educated alongside his non-disabled peers" in at least some sense. (*Id.* at 26–27.) In other words, the Hearing Officer appropriately weighed N.T.'s academic progress at the Lab School against the broader evidentiary record. *See N.G.*, 2022 WL 188403, at *3 (acknowledging that DCPS appropriately "relied on data from the Lab School" to prepare an IEP, to conclude that even though "N.G. was progressing in a small environment with tailored assignments and fewer distractions … a 'full-time' special education program was not appropriate because of least restrictive environment considerations").[12] This was appropriate.

---

[12] For similar reasons, Plaintiffs also miss the mark in arguing that the Hearing Officer failed to consider "N.T.'s status as a twice-exceptional learner." (Pls.' Mem. at 28–34.) Plaintiffs never define this term, but to the Court's understanding it refers to a child who is both intellectually gifted and also has a learning disability. Although it does not appear that the Hearing Officer employed this exact terminology in the decision, the underlying point was certainly captured. (*See* AR at 9 ("Student was both gifted and learning disabled.").) And these dueling considerations appear to be part of the reason why the Hearing Officer reasonably credited the District's efforts to strike a balance between specialized instruction and at least some time in a general education setting, in light of the IDEA's least-restrictive environment mandate.

At bottom, Plaintiffs are understandably dissatisfied that the Hearing Officer credited DCPS's witnesses over their own, but that dissatisfaction is not a basis for overturning the underlying decision given the deference owed to the Hearing Officer on matters of credibility.

III.   **The Hearing Officer Appropriately Concluded That Plaintiffs Were Able To Participate In N.T.'s Educational Placement**

Plaintiffs argue that the District separately "impeded N.T.'s right to a FAPE" by failing to allow them to "meaningfully participate" in N.T.'s educational placement across each of the relevant IEPs. (Pls.' Mem. at 24–29.) More specifically, they complain about DCPS's alleged failure to provide them with information about Deal and Jackson-Reed at various junctures. The Hearing Officer denied these claims, too, and the District defends those determinations here. The District says Plaintiffs' complaints are really focused on "site selection" which is distinct from "educational placement," and that any alleged procedural violation did not "significantly impede" Plaintiffs' participation. The Court agrees with the District, at least on the second point.

These claims focus on Plaintiffs' allegations that they were unable to meaningfully assess the specific schools where DCPS proposed to implement N.T.'s IEPs (Deal and Jackson-Reed). Plaintiffs complain that DCPS never provided answers to their written questions about Deal for the 2020–21 school year and never allowed them to visit Deal for the 2021–22 (in part by neglecting to contact them with information about the rescheduled open house). (Pls.' Mem. at 27.) Further, Plaintiffs complain that for the 2022–23 school year, they and their consultant "asked how the specialized instruction hours would be provided at Jackson-Reed during the IEP meeting, but the school system was unable to provide any information. (*Id.*; *see also* ECF No. 13.)

The Court quickly dispenses with the latter claim surrounding Jackson-Reed because the record excerpts Plaintiffs cite do not support their argument in the first place. Plaintiffs cite two segments of the administrative record: pages 1143 to 1145 and pages 1690 to 1691. (*See id.*) The

first segment is hearing testimony from Mr. Weinfeld—Plaintiffs' consultant—discussing the 2022 IEP that DCPS proposed to implement at Jackson-Reed, but those pages of the transcript do not indicate that he (or anyone else) asked the District for more information about the specialized hours, much less that there were stonewalled by DCPS in response to any such questions. (AR at 1143–44.) The second portion is testimony from Ms. Easterly, a DCPS witness, who agreed that for the 2022 IEP, the specialized hours were "not broken up by area," but there is no indication that Plaintiffs or their consultant unsuccessfully pushed for more details. On this record, the Court cannot possibly side with Plaintiffs in concluding that their ability to participate in N.T.'s proposed educational placement was significantly impaired or otherwise hampered in this way.

As to Plaintiffs' remaining complaints surrounding the IEPs that would have been implemented at Deal, the District first argues that Plaintiffs' claims lack merit because they are really focused on "site selection," which, according to the District, is not the same as "educational placement." (Def.'s Mem. at 29.) The District offers some support for this point. *See Z.B. v. Dist. of Columbia*, 382 F. Supp. 3d 32, 47 (D.D.C. 2019) ("[T]he the IDEA does not explicitly require parental participation in site selection.") (internal citation and quotation marks omitted). *But see D.K. v. Dist. of Columbia*, 962 F. Supp. 2d 227, 232 (D.D.C. 2013) ("Courts have defined the term 'educational placement' as meaning something 'between the physical school attended by a child and the abstract goals of a child's IEP.'") (quoting *Laster v. Dist. of Columbia*, 394 F. Supp. 3d 60, 64–65 (D.D.C. 2005)). For their part, Plaintiffs fail to respond to this argument (*see* ECF No. 13 at 8–10), which means the Court could deem it conceded. *See, e.g.*, *A.D. v. Creative Minds Int'l Pub. Charter Sch.*, 2020 WL 12654618, at *21 (D.D.C. Aug. 14, 2020).

On balance, the Court doesn't need to resolve that threshold question because even assuming Plaintiffs' complaints do implicate N.T.'s "educational placement" within the meaning

of the statute, Plaintiffs fail to show that the alleged violations "significantly impeded their opportunity to participate in the decision-making process," 20 U.S.C. § 1415(f)(3)(e)(ii), or otherwise "affected [N.T.'s] *substantive* rights," *Lesesne v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (emphasis in original); *see also Leggett*, 793 F.3d at 67 ("[A] procedural violation …will constitute a denial of a free appropriate public education only if it results in loss of educational opportunity for the student.") (cleaned up).

For starters, there is no dispute that Plaintiffs participated fully in each of the IEP meetings at issue, in some cases with the added support of their educational consultant, Mr. Weinfeld. (AR at 495, 878–79, 905–06.) And courts generally "refuse[] to find a serious deprivation of a parent's participation where a parent participated in the relevant meetings, as was the case here." *Barber v. Dist. of Columbia*, 2022 WL 22841025, at *26 (D.D.C. Dec. 9, 2022), *report and recommendation adopted*, 2023 WL 11835281 (D.D.C. Jan. 3, 2023); *J.T. v. Dist. of Columbia*, 496 F. Supp. 3d 190, 203–04 (D.D.C. 2020) (similar) (collecting cases), *aff'd*, 2022 WL 126707 (D.C. Cir. Jan. 11, 2022). Beyond that, the Court understands Plaintiffs' frustration surrounding the District's non-responsiveness to their written questions in the summer of 2020 and the challenges they faced in scheduling a visit at Deal during the 2021–22 school year.[13] But beyond voicing those frustrations, Plaintiffs never explain how they "significantly impeded" their ability to participate in the District's proposed educational placement, beyond simply stating that was so. And a "disagreement

---

[13] As Plaintiffs rightly acknowledge, in-person visits and observations at that time were not possible due to the COVID-19 pandemic. (Pls.' Mem. at 6–7.) Those undisputed circumstances explain at least one reason why the D.C. Code section that Plaintiffs invoke does not help them here either. D.C. Code § 38-2571.03 generally provides that parents "shall be allowed to view the child's instruction in … the setting where the child's instruction will occur," but the statute allows a school district to condition or restrict "such observations to "[e]nsure the safety of the children in a program," among other reasons. § 38-2571.03(5)(A) & (5)(D)(i). Surely DCPS's restrictions and limitations on in-person observations during COVID-19 fit that bill. Otherwise, as to Plaintiffs' written questions about Deal in the summer of 2020, nothing in this statute "require[s] a school to answer every question a parent may raise[.]" *H.R.*, 2024 WL 1344444, at *27.

with the *output* of the IEP process does not mean that [plaintiffs] were denied the chance to provide meaningful *input* into that process." *Wade v. Dist. of Columbia*, 2022 WL 17485678, at *2 (D.D.C. Dec. 7, 2022) (citing *Pavelko v. Dist. of Columbia*, 288 F. Supp. 3d 301, 306 (D.D.C. 2018)).

Plaintiffs point to no caselaw finding a substantive violation in these circumstances. And at least one recent case in this District rejected a similar argument. In *H.R.*, the plaintiffs argued that DCPS denied them "meaningful participation" in the placement process because it failed to satisfactorily respond to written questions and could not accommodate an in-person observation at the school where the IEP was to be implemented. *H.R.*, 2024 WL 1344444, at *27. As here, these circumstances arose in the "height of the COVID-19 pandemic," in the spring and summer of 2020. The court found the arguments unpersuasive because plaintiffs never explained how those circumstances "robbed them of their ability to participate in the IEP process," and neither did they offer "any case law that suggests the District's actions rise to the level of a FAPE denial." *Id.* These same takeaways hold here—perhaps even more so, given Plaintiffs' acknowledged history and experience with Deal, including the fact that their older child attended the school. (AR at 21.)[14] Indeed, Plaintiffs' briefing reflects that, despite the District's alleged procedural missteps, Plaintiffs already had sufficient information to allow them to conclude that Deal was "not an appropriate placement for N.T.," including based on the "size of the building" and the "class size." (Pls.' Mem. at 11 ("Based upon the previous visits to Deal for N.T. in the fall of 2019, the parents and Mr. Weinfeld concluded that Deal was not an appropriate placement for N.T.").) Plaintiffs' briefing here drives that point home as to each of the IEPs that DCPS proposed to implement at Deal—insisting that N.T. was "only on grade level due to the intensive support he received at Lab" such that "the services proposed by DCPS were insufficient," and that N.T. "required a full-time,

---

[14] Plus, as the Hearing Officer noted, Plaintiffs had the added benefit of specialized input from their consultant, Mr. Weinfeld, who also had considerable past experience with Deal. (AR at 30, 33, 1129.)

small, supported environment with integrated services" without "any time in the general education environment" at a school like Deal. (*Id.* at 6, 9.)

With that existing background knowledge, Plaintiffs fail to explain how or why the absence of additional written correspondence from DCPS or another in-person visit at Deal "significantly impeded" their participation in the process of affected N.T.'s substantive rights. The Court concludes that the Hearing Officer appropriately denied these claims.

## IV.    Tuition Reimbursement

Finally, the Court need not reach Plaintiffs' request for tuition reimbursement for N.T.'s placement at the Lab School for the 2020–21, 2021–22, and 2022–23 school years because it concludes that the District did not deny N.T. a FAPE during those years. *S.M.*, 2020 WL 7230266, at *7 n.3 ("Because the Court has determined that DCPS did not deny [student] a FAPE … it does not further consider Plaintiffs' request for tuition reimbursement."); *Pinto v. Dist. of Columbia*, 69 F. Supp. 3d 275, 285 (D.D.C. 2014) (similar).

## CONCLUSION AND RECOMMENDATION

Every parent wants the best for their child. And that is no less true in the realm of education than in any other aspect of life. Here, the Court has no doubt that Plaintiffs sincerely believe the Lab School is providing—and will continue to provide—the best possible education for N.T. based on his specific circumstances. Nobody can fault them for that. But the IDEA does not "guarantee the best possible education or even a 'potential-maximizing' one." *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458 U.S. at 197 n.21). The IDEA imposes a more modest obligation, requiring "an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403. The District's IEPs met that obligation here. As our Circuit aptly put it some time ago, "while The Lab School may well be in some respects, and

overall, a better place … for [N.T..], the Act simply does not place the comparative question before the court." *Knight by Knight v. Dist. of Columbia*, 877 F.2d 1025, 1030 (D.C. Cir. 1989).

 For the foregoing reasons, the undersigned **RECOMMENDS** that this Court **DENY** Plaintiffs' motion for summary judgment (ECF No. 8) and **GRANT** the District's (ECF No. 11).

Dated: July 9, 2025

                
          MATTHEW J. SHARBAUGH
          United States Magistrate Judge

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).